BABCOCK *v.* FISK.

1. GIFTS—INFANTS—CONTROL OF GUARDIAN.
   Outright gifts made to a donee during minority belong to the donee and, during minority, should be in charge of the guardian of the minor's estate.

2. SAME—INFANTS—ENDOWMENT FUND—INTENT OF DONORS.
   Determination of whether donations by public were an outright gift to infant donee who had lost both arms in an accident or to an endowment fund to be administered over a period of time to provide for such assistance as her welfare reasonably required should be made primarily in the light of that which motivated the contributors, rather than what might have been the concept, desire or thought of some of the solicitors or of those indirectly beneficially interested in the contributions.

3. SAME—INFANTS—ENDOWMENT FUND.
   Contributions from the public through solicitors who procured them for benefit of 5-year-old child who had lost both arms in an accident by way of establishing of an endowment fund to which many contributions were addressed directly as result of attendant newspaper publicity and which contemplated creation of an endowment fund to be administered over a period of time to provide for such assistance as the child's welfare reasonably required, vested the funds in the solicitors as agents of the donors in contemplation of consummation of plan of the solicitors for preservation, control and use of the fund.

---

REFERENCES FOR POINTS IN HEADNOTES
[1] 27 Am Jur, Infants, § 6; 24 Am Jur, Gifts, § 19; 25 Am Jur, Guardian and Ward, § 109.
[2–4] 54 Am Jur, Trusts, § 17.
[6, 7] 39 Am Jur, Parent and Child, § 35 *et seq.*
[8, 10] 54 Am Jur, Trusts, §§ 3, 276 *et seq.*
[9] 25 Am Jur, Guardian and Ward, § 23.
[11] 54 Am Jur, Trusts, §§ 181, 182, 485, 507.
[13] 10 Am Jur, Charities, §§ 31, 102.

4. EQUITY—ENDOWMENT FUND—TRUSTS.
   Issue as to disposition of funds, received by solicitors after 5-year-old child lost both arms in an accident, and claimed by such solicitors to belong to endowment fund to be administered over a period of time for her reasonable needs but claimed by child's father, as guardian of her estate, was within a general prayer for relief of solicitors' bill for approval of a trust instrument requesting court to enter decree "to properly carry out the intention of the contributors of the said fund" and such as should be "for the best interests" of the minor.

5. PRINCIPAL AND AGENT—SOLICITATION OF FUNDS—TRUSTS.
   Solicitors of funds, received after 5-year-old child lost both arms in an accident, fully performed their undertaking, as agents of the donors, by having deposited the accumulated fund with a suitable custodian and having presented for judicial determination the matter of creating a proper trusteeship.

6. PARENT AND CHILD—SUPPORT OF CHILD DURING MINORITY.
   The father of a minor is legally obligated to support, maintain and care for such minor during minority.

7. TRUSTS—CRIPPLED INFANT—PARENT.
   The father of a crippled child for whose benefit an endowment fund has been established from funds solicited from the public, should look to such trust fund only for such reasonable financial assistance as may be needed over and beyond his ability to meet the reasonable requirements of her rearing and education, since his service as parent of the child and trustee of such fund would be to attempt to serve in 2 incompatible positions.

8. EQUITY—JURISDICTION—TRUSTS—ENDOWMENT FUND FOR CRIPPLED CHILD.
   The circuit court in chancery properly took jurisdiction over financial aspect of trust, consisting of contributions to an endowment fund for benefit of child who had lost both arms in an accident.

9. GUARDIAN AND WARD—PROBATE COURT—JURISDICTION.
   Guardianship proceedings are within the jurisdiction of the probate court and must be controlled by that court and report made to it by the guardian annually.

10. TRUSTS—EQUITY—JURISDICTION—MINOR BENEFICIARY.
    Chancery court had jurisdiction to name suitable trustee to hold, invest, reinvest, manage and control trust consisting of con-

tributions to an endowment fund for infant whose arms were lost accidentally, to authorize trustee to use trust funds to meet the reasonable expenses of administering the trust and pay to guardian of the minor such sums as probate court may authorize guardian to receive from the trustee, which payments shall be *pro tanto* a full and complete release of the trustee.

11. GUARDIAN    AND    WARD—TRUSTS—COURTS—AUTHORIZATION    OF PAYMENT.

In order to obtain necessary funds to meet the reasonable needs of ward, the guardian of minor for whose benefit an endowment fund is set up from contributions made by solicitation of public when minor lost her arms in an accident, is permitted to receive payment not more often than semiannually, except under special circumstances, on petition to circuit court, authorized by probate court, and to which latter court guardian is required to account annually (CL 1948, § 704.38).

12. TRUSTS—INFANTS—DISPOSITION OF CORPUS.

In suit for approval of trust instrument and trustees of endowment fund, collected on behalf of 5-year-old girl who had lost both arms in an accident, under evidence of some donors that at time when the girl became of age it was to belong to her, the corpus of the trust then becomes her absolute property.

13. SAME—INFANTS—DISPOSITION    OF    CORPUS—CONTINGENCY    OF DEATH.

Contingent provision as to disposition of corpus of trust in the event of minor beneficiary's demise during nonage that fund should be paid over to the State society for crippled children or such other similar charity as the trustee shall direct and the court approve *held*, appropriate, where it was in accord with plan of plaintiffs, solicitors of contributions for the endowment fund when the minor lost her arms in an accident, and parents recognized that they were not intended to be direct beneficiaries of the fund.

14. APPEAL AND ERROR—REMAND—MODIFICATION OF DECREE—JURISDICTION OF TRIAL COURT—TRUSTS.

Upon modification of decree as to active trust for period of minority of crippled beneficiary, trial court on remand is vested with jurisdiction to hear and determine proceedings incidental to settlement of suitable trust instrument in accord with holding of Supreme Court and containing other proper provisions, for appointment of trustee and full control of administration of the trust.

15. COSTS—TRUSTS—RECORD AND BRIEFS ON APPEAL.
    No costs are awarded on appeal in suit for approval of a trust
    instrument and trustee where neither party fully prevails on
    appeal but trial judge is authorized in his discretion to allow
    the trustee to pay to respective parties the cost of printing
    record and briefs on appeal.

Appeal from Kent; Souter (Dale), J. Submitted January 4, 1950. (Docket No. 21, Calendar No. 44,591.) Decided February 28, 1950.

Bill by Nina Babcock and others against Merle Fisk, guardian of Charlene Fisk, a minor, for approval of trust instrument and trustees. Decree approving instrument. Defendant, through her guardian, appeals. Modified and remanded.

*Searl & White,* for plaintiffs.

*John F. Livingston* (*Alan H. Brightman,* of counsel), for defendant.

NORTH, J. In August, 1946, through a most regrettable accident, Charlene Fisk lost both of her arms. She was then nearly 5 years of age. Through activities of a number of sympathetic people looking to the raising of a fund to be used to meet the needs of the injured girl, contributions were received which ultimately totalled $32,359.53. Early in the undertaking it became evident that the accumulated fund would be in an amount much in excess of that necessary to care for Charlene's present and near future needs, which was the extent of the undertaking at its inception. This led to meetings of interested parties, formation of committees, and ultimately to the designation of plaintiffs herein as trustees, to formulate a plan in accordance with which the fund might be, under some trust arrangement, administered over a period of years in the best interest of Charlene. While this was in progress Charlene's

father, Merle Fisk, was appointed guardian of the estate of Charlene. Both he and the mother of this minor were dissatisfied with the plan proposed by plaintiffs and certain other committee members. A counter-plan, which pending this litigation was proposed in behalf of the guardian, was not satisfactory to plaintiffs, who had filed the bill in the instant case in which Merle Fisk, guardian of Charlene's estate, appeared as defendant. After hearing, the trial court decreed approval of plaintiffs' plan. The defendant guardian has appealed.

Plaintiffs, 5 of the solicitors who allege themselves to be "the surviving members of a committee selected to receive such contributions," set forth in the bill of complaint that "the idea of collecting moneys from the public (was) for the establishment of a fund to be known as 'Charlene Fisk Endowment Fund.'" The bill of complaint further alleges:

"Plaintiffs aver on information and belief that the general purpose of the persons making such contributions was to establish a permanent fund to meet such expenses as should be caused by the injuries suffered by Charlene Fisk, to furnish her such medical attention, treatments, and appliances as should be required by her, to provide her with special training made necessary or desirable by her injuries, to furnish her with higher education as should be to her best interests, and to make provisions for her future comfort and happiness to the end that she might live a normal life and overcome her handicaps.

"Plaintiffs are advised and therefore aver that the contributors to said fund by the making of their gifts, thereby made the members of the committee their agents with respect to such fund, and gave to plaintiffs the power and duty to enter into such trust agreements and other instruments, and to take such proceedings as should effectively provide for the care, control and distribution of said moneys during the lifetime of Charlene Fisk, and for the dis-

tribution of any part thereof remaining upon her death in accordance with the general purposes of the contributors to furnish to a crippled child a normal life."

. As indicating defendant's contention in respect to the foregoing phase of this litigation, we quote the following from his answer:

"Answering paragraph 3 of said bill of complaint, defendant admits that after the injuries were incurred, various public-spirited citizens conceived the idea of collecting moneys from the public, but denies that the purpose of the collection was for a 'fund' or that the moneys so collected were to be known as Charlene Fisk Endowment Fund. In further explanation of his answer  *  *  *  defendant avers that originally with defendant's acquiescence, certain citizens solicited gifts for Charlene Fisk and that the purpose and intention on the part of the donors and the solicitors, including the plaintiffs, was to obtain absolute gifts for Charlene Fisk; that said purpose and intention continued throughout the solicitation, even though the number of donors and the amount contributed exceeded the expectations of both the plaintiffs who acted as agent of defendant as Charlene Fisk's father and collected the gifts on his behalf and the donors who made such absolute gifts.  *  *  *  But defendant denies that the committee has the power to establish an endowment fund, and denies that the public was advised that the committee would have any control over the fund so collected except to account for the same as agent of defendant as Charlene Fisk's father.  *  *  *  Defendant admits (as plaintiffs allege) that said sum ($32,359.53) has been deposited with the Michigan Trust Company of Grand Rapids, Michigan."

It seems clear that if, as defendant asserts, the donors of the accumulated fund intended it as an outright gift direct to Charlene, then the decree of the trial court approving the trust plan was errone-

ous, for in that event the fund belonged to Charlene and, during her minority, should be in charge of the guardian of her estate. But, on the other hand, if it appears from the record that the donors contemplated creation of a fund to be administered over a period of time in providing Charlene with such assistance as her welfare reasonably required, and made the contributions to the solicitors as the agents of the donors in contemplation of the consummation of such a plan, then the contention of plaintiffs, at least in its general aspects, should be approved by the court.

Hence, it is of first importance to determine in which of the above capacities the solicitors of this fund carried on their activities. In this connection appellant stresses the fact that practically at the inception of formulating a plan for soliciting contributions his approval as Charlene's father was sought by one of the solicitors, and after some discussion he, Charlene's father, gave his consent; but in doing so emphasized that the collection was to be for Charlene; that in the latter part of September appellant advised 2 of the active solicitors it had been indicated to him that the solicitors no longer regarded the collection as an outright gift to Charlene, and on that account he revoked his former permission to solicitation of funds; that very shortly thereafter one of the solicitors visited the Fisk home and there told Mr. and Mrs. Fisk that the collection of funds could not be discontinued and assured them, as stated in appellant's brief, "that every penny of the money was Charlene's. On the basis of this, Fisk permitted the solicitation to continue." Also, in support of appellant's contention that the contributions were intended as gifts direct to Charlene, a substantial number of letters, approximately 33, were submitted in evidence. Some of these letters, while they came in envelopes directed to "The Char-

lene Fisk Endowment Fund," were addressed to: "Dear Charlene," "Dear Little Charlene," and some contained such expressions as: "I am enclosing $10.00 to help in a small way little Charlene," and "To help Charlene as much as earthly help can." In other of these envelopes mailed to "The Charlene Fisk Endownment Fund," the enclosed letters were addressed to: "The Charlene Fisk Endowment Fund, Sparta, Michigan," and with the salutations of "Gentlemen" or "Dear Sirs."

As against appellant's contention, hereinbefore noted, the record discloses other circumstances attending the solicitation of contributions which seem to us to bear very materially upon what must have been in the minds of the contributors and induced them to make their donations, and which are indicative of whether their contributions were made with the intent of making direct gifts to Charlene or with the intent, instead, of creating a fund which would be administered by some proper agency in promoting, over a period of time, the welfare of Charlene. Determination of this issue, under the circumstances and conditions attending the instant case, should be made primarily in the light of that which motivated the contributors, rather than what might have been the concept, desire or thought of some of the solicitors, or of those indirectly beneficially interested in the contributions. Our review of this record brings the conclusion that the main factor which successfully promoted this worthy undertaking was the appealing publication given to it by certain newspapers, and that it was from and through such publicity that at least the decidedly major portion of the contributors obtained their information as to the character of this undertaking, and in the light of which their contributions were made to an undertaking or purpose thus disclosed to them.

Horace J. Kurtz, editor of the Sentinel Leader, a weekly paper published in Sparta, was one of those who, immediately following the accident, became interested in doing something to help Charlene. After conferences with other interested individuals and after Charlene's father had been consulted as to solicitation of contributions, Kurtz prepared and published an editorial on August 22, 1946, approximately a week after Charlene suffered her accident. After adverting to the tragedy which had befallen Charlene, the editorial under the heading: "AN ENDOWMENT FOR A LITTLE GIRL WITHOUT ARMS" presented an appeal for contributions from which we quote:

"Medical science has saved the girl's life and she is reported as being on the way to recovery. For this we are grateful, but what about Charlene's future? * *. * Let's all get behind Charlene, help and encourage her by supporting an endowment fund in her behalf. * * * We are asking you to contribute generously of your means to make this endowment worth while. * * * All checks and contributions should be made payable to the CHARLENE FISK ENDOWMENT FUND, c/o Sentinel Leader, Sparta, Mich. The checks could also be mailed to any bank in Sparta, Kent City, Rockford or Cedar Springs, or to the Cedar Springs Clipper, or the Rockford Register."

In the following week's issue (August 29, 1946) of the Sparta Sentinel Leader, an article appeared under the heading: "STATE-WIDE INTEREST IS SHOWN IN CHARLENE FISK ENDOWMENT AS CONTRIBUTIONS FLOOD LOCAL MAILS." We quote the following:

"It wasn't long, following Charlene's accident, that a plan was set in motion to establish an endowment fund to be used for her future comfort and happiness. * * * The goal of $10,000 will be surpassed by a comfortable margin as more industries,

business firms, organizations and individuals become informed of the Endowment. * * * All checks for the Charlene Fisk Endowment Fund received by the Sentinel-Leader are delivered to the central collecting office daily."

The fund raising campaign was indorsed and promoted by other newspapers in the general vicinity of Sparta. An article which appeared August 29, 1946, in the Rockford Register was entitled: "ENDOWMENT FUND PLANNED FOR LITTLE CHARLENE FISK." The article contained the following:

"People of Rockford, Sparta and Cedar Springs have formed an organization, the purpose of which is to secure money to set up an endowment fund for little Charlene which will partially help her to make up for the loss of her arms. * * * For the information of people of Rockford and vicinity who want to help in this endowment cause, all moneys should be mailed to the Charlene FISK ENDOWMENT FUND, SPARTA, MICHIGAN."

On August 23, 1946, an article appeared in the Grand Rapids Herald, which in part read:

"Their (the solicitors') purpose under the direction of Floyd Schut, chairman of the Committee of 40, is to 'take care' of little Charlene Ruth in the form of an endowment fund which will be raised by contributions, both large and small."

The Grand Rapids Press on August 27, 1946, published an article, the first paragraph of which read:

"With workers in Sparta headquarters nearly 'snowed under' by heavy mail, the Charlene Fisk Endowment fund passed the $2,000 mark Tuesday with many contributions as yet uncounted."

An article entitled " 'BUSHEL OF MAIL' RECEIVED FOR CHARLENE's ENDOWMENT" in the Grand Rapids Press of August 28, 1946, contained the following:

"Sympathetic folk all over western Michigan are sending contributions to the endowment fund, established to pay for artificial arms and other equipment the child will need and for her education and training. * * * Contributions should be mailed to: The Charlene Fisk Endowment Fund, Sparta, Mich., with the name and address of the giver enclosed."

On August 22, 1946, the Cedar Springs Clipper published an article, the first paragraph of which read:

"A Charlene Fisk Foundation is being established by The Cedar Springs Clipper, The Rockford Register, and the Sparta Sentinel Leader, in order that Charlene Fisk, 6 years old, who had both arms severed in an accident at the farm home two weeks ago, may be assured financial security."

It is fair to presume that newspaper articles of like purport were published elsewhere because contributions were received from various localities in the State and also to some extent from outside the State. Obviously there is no way of ascertaining with exact accuracy the individual intent of each of the many hundred donors. A few of them testified at the hearing of the case. But from the record we are convinced that in general, contributions were made with the thought and intent on the part of the contributors that the activity was being fostered by persons who proposed to establish a fund, labeled as an endowment, which would be held in trust for Charlene and administered over a period of time as her welfare might reasonably require. It is quite inconceivable that the donors designed a direct and absolute gift of so large a sum of money to a 5-year-old girl, without contemplating that some plan for the preservation, control and use of the fund would be adopted; and that the perfecting of such a plan would be accomplished by those who solicited the contributions.

A strikingly similar case came before an Indiana court and in its opinion the court said:

"The money in question was contributed by many persons; it was a contribution springing from humane and generous impulse; it went into the hands of those collecting it without any specific direction from the several donors as to how it should be handled; specific directions by each individual contributor was [were?] not only impracticable, but the giving of the same would naturally, under the circumstances, militate against the accomplishment of the object sought, for no person would want to accept money in small sums from hundreds of persons and undertake to apply each donation to some particular purpose which might be suggested by the whim of the individual donor. These persons when they thus placed their money in the hands of these collectors thereby made such collectors their agents for the final disposition of said fund, according to the general purpose." *Union Trust Co.* v. *Children's Aid Ass'n,* 77 Ind App 575 (134 NE 207).

As in the cited case, so under the circumstances of the instant case, it appears that the solicitors of the fund here involved acted as agents of the donors. Having concluded that in the accumulation of this so-called trust fund the plaintiffs herein and their associates acted as agents of the donors, and in consequence that they, at least the plaintiffs, now occupy the position of trustees, the question at once arises as to what, under the circumstances of this case, should be decreed to be the scope of the duties of such trustees. This issue is within the prayer for relief sought, which in part reads:

"That plaintiffs may have such other relief, and this court may make such further decree as may be required to properly carry out the intention of the contributors of the said fund and shall be for the best interests of said Charlene Fisk."

With consent of all parties concerned a suitable custodian of the fund has been selected and now holds the fund subject to the further order of the court. But obviously the necessities of the case require provision for a plan which will justly and effectively carry out the trust which the donors contemplated. In our opinion the trust instrument approved by the trial court vests 3 of the plaintiffs (Nina Babcock, David J. Johnson, William A. Rogers), as trustees, with greater control in the execution of this trust throughout the lifetime of Charlene than could have been contemplated by the donors, and in a way that to some extent, which need not be detailed, will be unworkable. We note only the following, which in quite a material way would substitute the judgment and control of the trustees in the place of the judgment and control of Charlene's parents and of her guardian during her minority, and thereafter control the fund for the remainder of her life:

"The trustees shall have the following powers: * * * The power and complete discretion to use such part of the income and principal as in their judgment shall be for the benefit of said Charlene Fisk for medical attention, for treatment, appliances, special training, higher education, and for her future comfort and happiness. * * *

"The trust herein created shall continue throughout the lifetime of said Charlene Fisk, and shall terminate upon her death. Upon the death of Charlene Fisk, any part of the trust remaining, including principal and unexpended income, shall go and belong to, and the trustee shall pay and deliver the same to the Michigan Society for Crippled Children and Afflicted adults, or such other similar charity devoted to the care, treatment and rehabilitation of crippled children as the trustees may select and said circuit court for the county of Kent, in chancery, shall approve."

In brief, we are of the opinion that, as agents of the donors, plaintiffs have fully performed their laudable undertaking by having deposited the accumulated fund with a suitable custodian and having presented for judicial determination the matter of creating a proper trusteeship.

We are not in accord with appellant's contention that as Charlene's guardian he is entitled to the custody and management of these funds during her minority. Being her father he is legally obligated to support, maintain and care for Charlene during her minority, and should look to the trust fund only for such reasonable financial assistance as may be needed over and beyond the father's ability to meet the reasonable requirements of Charlene's rearing and education. For this father, charged with his parental duties, to also assume the duties of trustee of the fund contributed by the donors would be for him to attempt to serve in 2 incompatible positions.

Under the unusual circumstances of this case we think there is need of separating the financial aspect of the trust from the duties and responsibilities of the guardianship. The circuit court in chancery has taken jurisdiction of the former, and, we think, properly so. But the guardianship proceedings are clearly within the jurisdiction of the probate court and must be controlled by that court, to which the guardian is required to report annually.

A trust instrument should be prepared and submitted for approval of the circuit court in chancery naming a suitable trustee to be charged with the duty of holding, investing, reinvesting, managing and controlling the trust estate under the direction and control of the circuit court in chancery; and the trustee should be authorized to use trust funds to meet the reasonable expenses of administering the trust, and to pay from time to time to the guardian of Charlene Fisk during her minority such sums as

the probate court may by order authorize the guardian to receive from the trustee, and any and all payments so made to the guardian shall be *pro tanto* a full and complete acquittance and release of the trustee.

For the purpose of enabling him to obtain necessary funds to meet the reasonable needs of his ward and the expenses of administering his ward's estate, the guardian should from time to time petition the probate court for an order authorizing the guardian to draw specified amounts from the trustee, such orders and payments by the trustee to be made not oftener than semiannually, except under special circumstances, and under an order of the circuit court in chancery on the guardian's petition authorized by the probate court, and after notice to the trustee. The amounts to be paid to the guardian should be determined by the probate court on petition of the guardian and should be sufficient to meet the expenses of administering the guardianship to the date of the order and also to cover estimated prospective expenditures of the guardianship for a future period not exceeding 1 year. The receipts and disbursements of the guardian should be reported by the guardian in his annual account (CL 1948, § 704.38 [Stat Ann 1943 Rev § 27.3178(289)]) to the probate court and be subject to its approval.

Another matter herein controverted is this: When will the corpus of the trust become vested? Here again we must look to the intent of the donors. As above indicated it is quite incredible that the donors contemplated an outright gift of a large fund to a 5-year-old child. There is no claim, nor could there be, that the fund was a gift intended for Charlene's parents, or either of them. It seems far more plausible that the donors contemplated that, as in a normal case, the minor Charlene would receive the then corpus of the estate in her own right when she be-

comes 21 years of age, and not prior thereto. We quote from such testimony of donors as is contained in the record, indicating the name of the respective witnesses:

Douglas Fairbanks: "I intended that the funds would all go to her (Charlene) when she reached the age of 21."

Christine Kowalski: "*Q.* What, if anything, did you want to be done with the funds after Charlene reached the age of 21 years?

"*A.* I guess I took it for granted after she grew up she would have the money."

Norman E. Dogger: "Well, I took it for granted, I believe that there wouldn't be any trust any more. It would be turned over to Charlene at that time when she became of age."

Edna Keslar: "*Q.* What, if anything, did you intend to be done with the funds after Charlene reached 21 years of age?

"*A.* Well, it was given to Charlene to begin with, naturally, it should be Charlene's.

"*Q.* Is that what you intended at the time you made the contribution?

"*A.* That was my full intention."

From the foregoing and other matters appearing in the record, we conclude that the donors of this fund intended that any portion thereof, or income thereon, remaining at the time Charlene became 21 years of age should then become her absolute property.

The remaining major matter for consideration and determination on this appeal is this: In event of Charlene's demise before she becomes 21 years of age, what disposition shall be made of the then remaining assets of the trust? In appellant's brief it is said: "We are not at all concerned with the right of the parents to inherit these funds." Al-

ready we have held against appellant's contention that the donations to this fund were present gifts direct to Charlene, of which she became the sole owner; and in that event appellant has asked that it be decreed that upon termination of the trust the then residue of the trust estate be disposed of in the manner provided in a proposed trust instrument drafted and submitted by appellant. As adapted to our holding herein appellant's proposal reads:

"Should Charlene Fisk die before * * * (the termination of the trust), then any principal and accumulation of income, if any, then on hand, shall be paid by the trustee over to Michigan Society for Crippled Children, or such other similar charity as the trustee shall direct and the court approve."

This contingent provision as to the disposition to be made of the residue of the trust assets is also in accord with the position taken by plaintiffs. We approve it as an appropriate provision, because in event of Charlene's demise during her minority it seems probable a substantial amount would still be held in the trust and, as before noted, it was not the intent of the donors that Charlene's parents should be direct beneficiaries of the fund contributed, nor was it the donors' intent that the control or disposition of the fund should be vested in Charlene until she became 21 years of age.

The decree entered below will be modified and the case remanded to the trial court with jurisdiction to hear and determine proceedings incidental to the settlement of a suitable trust instrument in accord with our holding herein and containing such other provisions as to the trial court may be deemed proper but not in conflict or inconsistent herewith, to appoint a trustee, and thereafter to supervise and fully control the administration of the trust.

As we understand the record, we have covered in the foregoing opinion all matters as to which there is any serious controversy. Other questions raised in appellant's brief are not such as would affect our decision and need not be reviewed herein.

Neither party to this appeal having fully prevailed, no costs will be awarded; provided however, that the trial judge in his discretion may allow as a proper charge to be paid by the trustee to the respective parties the cost incurred by them in printing the record or briefs on this appeal.

BOYLES, C. J., and REID, DETHMERS, BUTZEL, CARR, BUSHNELL, and SHARPE, JJ., concurred.